1  Robert S. Green (State Bar No. 136183)
2  James Robert Noblin (State Bar No. 114442)
   Lesley E. Weaver (State Bar No. 191305)
3  **GREEN & NOBLIN, P.C.**
4  700 Larkspur Landing Circle, Suite 275
   Larkspur, California 94939
5  Telephone: (415) 477-6700
   Facsimile: (415) 477-6710
6  Email: gnecf@classcounsel.com
7  -and-
8  4500 East Pacific Coast Highway
   Fourth Floor
9  Long Beach, California 90804
10 Tel: (562) 391-2487

11 Attorney for Plaintiffs,
12 JAMES CASSELLA and SANDRA WEITSMAN

13
14             UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA
16
17

| | |
|---|---|
| 18 JAMES CASSELLA and SANDRA WEITSMAN, Individually and on Behalf of All Others Similarly Situated, | Case No.   CV13-03991 PA (JEMx) |
| 19 | |
| 20 | CLASS ACTION |
| 21         Plaintiff, | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| 22 | |
| 23    v. | |
| 24 EXIDE TECHNOLOGIES, JAMES R. BLOCH, PHILLIP A. DAMASKA, R. PAUL HIRT, LOUIS E. MARTINEZ, | DEMAND FOR JURY TRIAL |
| 25 | |
| 26 | |
| 27         Defendants. | |
| 28 | |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Plaintiffs James Cassella and Sandra Weitsman ("Plaintiffs") individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Exide Technologies ("Exide" or the "Company"), publicly available records of the Department of Toxic Substances Control of the State of California and the South Coast Air Quality Management District of the State of California, as well as media reports about the Company and conference call transcripts. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of the common stock of Exide between June 1, 2011 and April 24, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include Exide, James R. Bloch ("Bloch"), Phillip A. Damaska ("Damaska"), R. Paul Hirt ("Hirt"), and Louis E. Martinez ("Martinez").

2.     Defendant Exide was incorporated in Delaware on November 23, 1966 and is headquartered in Milton, GA. It operates in 89 countries, producing, recycling

1

and distributing lead-acid batteries. Its global transportation and industrial energy groups provide a range of stored electrical energy products and services for industrial and transportation applications.  On May 5, 2004, under a Plan of Reorganization from Chapter 11 bankruptcy, the Company issued 25,000,000 shares and listed its shares on NASDAQ under the trading symbol "XIDE."

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under §§10(b), 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

4.     Venue is proper in this district pursuant to §27 of the Exchange Act. Acts and transactions giving rise to the violations of law complained of occurred in this district. The Company's recycling facility that exposed residents to potentially fatal levels of arsenic lies within this District, and all the relevant witnesses and facts are within the jurisdiction of this District.

5.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

2

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PARTIES**

6.    Plaintiffs purchased Exide common stock during the Class Period as set forth in the Certifications attached hereto, and incorporated herein by reference, and suffered damages thereon.

7.    Defendant Exide is organized under the laws of the State of Delaware and headquartered in Milton, GA. During the Class Period, Exide had millions of shares of common stock outstanding, which shares traded in an efficient market on NASDAQ under the ticker symbol "XIDE." Exide was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investors and analysts. Exide also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

8.    Defendant Bolch has served as Exide's President and Chief Executive Officer ("CEO") since July 2010.

9.    Defendant Damaska has served as Exide's Executive Vice-President and Chief Financial Officer ("CFO") since April 2008. Prior to that time, Defendant Damaska held Senior Vice-President and Controller roles at the Company.

10.    Defendant Hirt has served as President of Exide America since November 2011.

11.    Defendant Martinez has served as Vice President, Corporate Controller, and Chief Accounting Officer since March 2008.   Prior to that time, Defendant

3

Martinez had served as the Company's Assistant Corporate Controller since May 2005.

12.     Defendants Bolch, Damaska, Hirt and Martinez are sometimes referred to herein collectively as the "Individual Defendants."

13.     During the Class Period, the Individual Defendants possessed the power and authority to control the contents of Exide's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

14.     Exide operates in 89 countries, producing, recycling and distributing lead-acid batteries.  Among the various activities of the Company, Exide operates

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

eight battery recycling facilities worldwide, including a recycling facility in Vernon, California, located approximately four miles due south of downtown Los Angeles.

15. On March 21, 2011, the State of California's Department of Toxic Substances Control ("DTSC") issued Exide's Vernon facility with its First Notice of Deficiency, citing hazardous conditions that did not comply with the State of California requirements for toxic substance storage. Based on this Notice of Deficiency, Defendants were aware of adverse information that should have been disclosed to shareholders. Despite this knowledge, Defendants omitted information regarding the Vernon facility's hazardous conditions and/or the Notice of Deficiency from Exide's Form 10-K annual report for the fiscal year ended March 31, 2011, or in any of the Company's subsequent press releases or other SEC filings.

16. On August 2, 2012, DTSC presented Exide with a Second Notice of Deficiency, again citing "major deficiencies" in the Vernon facility's "groundwater monitoring and/or clean closure criteria," which still were not in compliance with California requirements. Again, despite clear knowledge of the Vernon facility's non-compliance with California regulatory requirements, Defendants failed to disclose such adverse information to shareholders. However, while Exide disclosed in its Form 10-Q for the quarterly period ended June 30, 2012, filed in August 2012, that it had received notices of violations from the South Coast Air Quality Management District ("AQMD") as well as an administrative enforcement order from DTCS, the Company misleadingly presented the alleged violations as minor infractions and

5

further misleadingly suggested that the offending conditions had been remedied.   In truth, Exide's Vernon facility was at that time emitting extremely toxic contaminants into the air and water.

17.   On March 22, 2013, the Vernon recycling facility was cited by AQMD as posing a greater cancer risk to residents of Southern California than any of the more than 450 facilities the agency has regulated in the last 25 years.   In fact, spokesman for AQMD, Sam Atwood, summarily put the Vernon facility's violations into perspective by explaining that in his experience with the AQMD there has been "nothing close to this…never."

18.   Following the Agency's citation, on April 3, 2013, Los Angeles City Council members held a public hearing asking the government to press charges against the Company to correct the health risk posed by the Company's environmental contamination.   On April 4, 2013, the *Los Angeles Times* published an article discussing the April 3, 2013 public hearing held by Los Angeles City Council members, wherein officials with AQMD testified before the committee about the risks posed by Exide's Vernon facility.   According to the *LA Times* article, AQMD officials became aware of the surprisingly high levels of arsenic emissions from Exide in late 2010.   AQMD officials explained that it took AQMD two years to determine where in the Vernon plant the dangerous emissions were coming from and to quantify the risk to people and the environment.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

19.     Also on April 4, 2013, news source *Debtwire.com* published a report that Exide had hired financial advisory firm Lazard Ltd. and the law firm of Akin Gump LLP, both bankruptcy experts, to advise on its financial restructuring after prior restructuring efforts stalled.

20.     In response to these adverse disclosures, the price of Exide's shares fell $1.24 per share to close at $1.37 per share (a 46% drop), on April 4, 2013, before trading in the stock was halted.

21.     On April 25, 2013, before the market opened, Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring the Company to suspend operations at its Vernon facility, alleging that Exide's underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

22.     In response to this news, Exide's shares closed at $1.02 per share on April 25, 2013, compared to the closing price of $1.34 on April 24, 2013 — a drop of 24%, on heavy trading volume.

23.     A press release issued by Consumer Watchdog, a California consumer advocacy organization that, among other things, investigates corporate misbehavior, sheds further light upon the hazardous conditions at the Vernon facility and Defendants' knowledge of same.  According to the May 30, 2013 press release:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A letter sent earlier this month to DTSC Director Debbie Raphael from DTSC Senior Hazardous Substances Engineering Geologist Philip Chandler makes clear that top staff resisted internal recommendations to do what was necessary to ensure long-term safety at the plant. The letter says:

• DTSC "has conveniently ignored for years" lead, arsenic and other heavy metal emissions that were permitted by air regulators but accumulated to hazardous waste levels on the ground.

• *Exide's own arsenic emissions source tests in 2010 and 2012, showed a significant spike in emissions over tests in 2006 and 2008. "DTSC had the ability to evaluate the change in emissions risk years before it issued this order" suspending the plant's operations.*

\*\*\*

The Exide facility emitted hazardous waste for years under a permit from the South Coast Air Quality Management District. This waste had a history of depositing and accumulating on the ground and roofs around the site.

\*\*\*

Though DTSC regulators in Southern California pushed the company to investigate and clean up, higher ups deferred taking corrective action in favor of issuing a final permit to the company that never materialized. "While lead and arsenic were piling up, soaking into the groundwater, and also flowing into the Los Angeles River, Exide and its negligent operations were falling through the regulatory cracks," said [Consumer Watchdog spokeswomen, Liza] Tucker. "And top DTSC managers refused to force the company, which is a polluter on a national scale, into compliance."

(Emphasis added).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **Materially False and Misleading Statements**
## **Issued During the Class Period**

24.    The Class Period begins on June 1, 2011. On that day, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2011. The Form 10-K was signed by Defendants Bolch, Damaska and Martinez.   In the Form 10-K, Defendants made the following disclosures:

> ***The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which could adversely affect its business, financial condition, cash flows or results of operations.***
>
> Throughout the world, the Company manufactures, distributes, recycles, and otherwise uses large amounts of potentially hazardous materials, especially lead and acid. As a result, the Company is subject to a substantial number of costly regulations. In particular, the Company is required to comply with increasingly stringent requirements of federal, state, and local environmental, occupational health and safety laws and regulations in the U.S. and other countries, including those governing (1) emissions to air, discharges to water, noise and odor emissions; (2) the generation, handling, storage, transportation, treatment, and disposal of waste materials; and (3) the cleanup of contaminated properties and human health and safety. Compliance with these laws and regulations results in ongoing costs. The Company could also incur substantial costs, including cleanup costs, fines, and civil or criminal sanctions, third-party property damage or personal injury claims, or costs to upgrade or replace existing equipment, as a result of violations of or liabilities under environmental laws or non-compliance with environmental permits required at its facilities. In addition, many of the Company's current and former facilities are located on properties with histories of industrial or commercial operations. Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company could become liable for the cost of investigating or remediating contamination at these properties if contamination requiring such activities is discovered in the future. There is also inherent difficulty in assessing the Company's potential liability due to the large number of other potentially responsible parties. For example, a demand for the total cleanup costs of a landfill used by many entities may be asserted by the government using joint and several liability theories. Although the Company believes that there is a reasonable basis in law to believe that it will ultimately be responsible for only its share of these remediation costs, there can be no assurance that the Company will prevail on these claims. In addition, the scope of remedial costs or other environmental injuries are highly variable, and estimating these costs involves complex legal, scientific and technical judgments. The Company may become obligated to pay material remediation-related costs at its closed Tampa, Florida facility in the amount of approximately $13.2 million to

9

$19.9 million, and at the Columbus, Georgia facility in the amount of approximately $5.7 million to $8.5 million.

The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved. Private parties, including current or former employees, could bring personal injury or other claims against the Company due to the presence of, or exposure to, hazardous substances used, stored or disposed of by it, or contained in its products, especially lead. Environmental requirements are complex and have tended to become more stringent over time. These requirements or their enforcement may change in the future in a manner that could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. The Company has made and will continue to make expenditures to comply with environmental requirements. These requirements, responsibilities and associated expenditures, if they continue to increase, could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. While the Company's costs to defend and settle claims arising under environmental laws in the past have not been material, the Company cannot provide assurance that this will remain so in the future.

On November 12, 2008, the Environmental Protection Agency ("EPA") published new lead emissions standards under the National Ambient Air Quality Standards ("NAAQS"), which became effective on January 12, 2009. The new standards further restrict lead emissions by reducing the off-site concentration standards for lead in air from 1.5 micrograms per cubic meter to 0.15 micrograms per cubic meter. The Company believes that the new standards could impact a number of its U.S. facilities. Under the Clean Air Act ("CAA"), publication by the EPA of these ambient air quality standards initiates a process by which the states develop rules implementing the standards. Recently, some states have accelerated their implementation and the Company is working with these states to meet their requirements. Although the final impact on the Company's operations cannot be reasonably determined at the current time, the Company believes that the financial impact of compliance with these lead emissions standards on its U.S. facilities will be funded through normal operations. Noncompliance with these standards could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

\*\*\*

### Environmental Matters

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now

10

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

designated as hazardous substances and hazardous wastes. …

\*\*\*

Separate from the EPA Settlement, the Company monitors and responds to inquiries from the EPA, equivalent state and local agencies and others at approximately 50 federally defined Superfund or state equivalent sites. While the ultimate outcome of the environmental matters described in this paragraph is uncertain due to several factors, including the number of other parties that may also be responsible, the scope of investigation performed at such sites and the remediation alternatives pursued by such federal and equivalent state and local agencies, the Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of March 31, 2011 and March 31, 2010, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.2 million and $31.8 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $19.9 million depending on final State of Florida requirements. The

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

25.     On June 1, 2011 the Company reported its Fiscal 2011 Fourth Quarter and year end results. The Company's press release reported: net sales for fiscal 2011 aggregated $2.9 billion as compared with $2.7 billion for the prior fiscal year period, an increase of approximately 7.5%; net income for fiscal 2011 of $26.4 million or $0.33 per diluted share as compared to a net loss of $11.8 million or ($0.16) per share in the prior year period. The Company reported that "[t]he improvement in net income was driven by significantly lower restructuring and impairment charges, higher gross profit and lower operating expenses. Adjusted net income for fiscal 2011 was $57.9 million or $0.72 per share. This compares to adjusted net income of $48.5 million or $0.64 per share for fiscal 2010."

26.     Defendant Bolch stated, "We are pleased with the progress made during fiscal 2011. We have successfully realigned our businesses on a regional basis and made some key management changes, further strengthening an already solid executive team." Bolch further stated, "The cost increases experienced during the last several months of fiscal 2011 coupled with delayed pricing action will likely cause first quarter profits to be slightly down from the comparable fiscal 2011 period. We remain

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

confident, however, in our ability to continue to improve the operating performance of the Company and expect full year fiscal 2012 operating income to be in the range of $160 million to $170 million, up from $95.8 million in fiscal 2011."

27.    The disclosures made in the paragraphs above were materially misleading because the disclosures omitted the following material facts known by Defendants:

    a. Since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

    b. The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

    c. The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection  of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

28.    Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008.  Defendants were also on notice of major deficiencies in the Vernon facility's compliance with

13

California regulations based on the Notice of Deficiency issued by the DTSC in March 2011.

29.     On August 4, 2011 the Company reported its Fiscal 2012 First Quarter results. The Company's press release reported: fiscal 2012 first quarter consolidated net sales were $745.1 million as compared to net sales of $644.7 million in the fiscal 2011 first quarter; and, fiscal 2012 first quarter operating income increased approximately 30% to $13.6 million compared to $10.5 million in the prior year first quarter primarily due to improved manufacturing efficiencies and the significant reduction in restructuring and impairment costs. Operating income for the period was favorably impacted by approximately $1.8 million of foreign currency translation.

30.     Defendant Bolch stated, "Our first quarter results exceeded our previously communicated guidance and we are pleased with the continuing improvements in our European businesses and Industrial Americas.  However, we continue to be disappointed with results for our Transportation Americas business, which limited first quarter results. Actions are being finalized to address the overall cost structure of this business."

31.     On August 4, 2011 Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended June 30, 2011.  The Form 10-Q was signed by Defendant Damaska.  In the Form 10-Q Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local

14

environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of June 30, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.7 million and $28.2 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to

$20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

32.   The disclosures made in the paragraph above were materially misleading because the disclosures omitted the following material facts known by Defendants:

a.  Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

b.  The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

c.  The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

33.   Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012

16

that showed a significant spike in emissions over tests in 2006 and 2008.  Defendants were also on notice of major deficiencies in their compliance with California regulations based on the Notice of Deficiency issued on the Vernon facility by the DTSC.

34.    On November 7, 2011 the Company reported its Fiscal 2012 First Quarter results. The Company's press release reported: net sales for the fiscal 2012 second quarter of $773 million, up $105 million versus the prior year second quarter and up $28 million sequentially; operating income for the current year period of $21.2 million versus $26.3 million of operating income in the second quarter of fiscal 2011, which includes an out of period charge of approximately $5.0 million pretax for the Transportation Europe and ROW segment relating to the intentional misstatements of production and inventories. "[W]e are taking aggressive actions to reduce costs and improve operating results, particularly in the Transportation Americas segment," Defendant Bolch added.

35.    On November 9, 2011 Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended September 31, 2011.  The Form 10-Q was signed by Defendant Damaska.  In the Form 10-Q Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

17

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of September 30, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets are approximately $28.2 million. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:
***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

18

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

36.     The disclosures made in the paragraphs above were materially misleading because the disclosures omitted the following material facts known by Defendants:

a.   Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

b.   The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

c.   The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection   of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

37.     Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008.  Defendants

19

were also on notice of major deficiencies in the Vernon's facility's compliance with California regulations based on the Notice of Deficiency issued by the DTSC.

38. On February 9, 2012 Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended December 31, 2011. The Form 10-Q was signed by Defendant Damaska. In the Form 10-Q Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company received a number of notices of violation issued by the Pennsylvania Department of Environmental Protection ("PADEP") for alleged violations of pollution control laws at its Reading, Pennsylvania recycling facility. To resolve these notices of violation, the Company negotiated a settlement agreement with PADEP that included monetary sanctions of $0.12 million to PADEP. The settlement also included an agreement to perform an emission control project.

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

20

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of December 31, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $27.7 million and $28.2 million respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain

21

historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

39.    The Company also issued a press release that reported Net sales for the fiscal 2012 third quarter of $784.1 million versus $800.3 million in the prior year's third quarter, operating income for the current year period of $28.2 million versus $49.7 million of operating income in the third quarter of fiscal 2011, and net income for the fiscal 2012 third quarter of $68.2 million or $0.84 per diluted share, the result of favorable discrete income tax items. This compared to the prior year period net income of $31.2 million or $0.38 per diluted share.

40.    Jim Bolch, President and Chief Executive Officer, stated, "[t]he decline in net sales this period is primarily due to the lack of normal seasonal weather across North America and Europe, which had an adverse impact on aftermarket transportation battery sales."

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

41.   The disclosures made in the paragraphs above were materially misleading because the disclosures omitted the following material facts known by Defendants:

   a.   Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

   b.   The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

   c.   The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection  of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

42.   Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008.  Defendants were also on notice of major deficiencies in the Vernon facility's compliance with California regulations based on the Notice of Deficiency issued by the DTSC.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

43.     On June 7, 2012, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2012.  The Form 10-K was signed by Defendants Bolch, Damaska and Martinez  In the Form 10-K Defendants made the following disclosures:

> **The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which could adversely affect its business, financial condition, cash flows or results of operations.**
>
> Throughout the world, the Company manufactures, distributes, recycles, and otherwise uses large amounts of potentially hazardous materials, especially lead and acid. As a result, the Company is subject to a substantial number of costly regulations. In particular, the Company is required to comply with increasingly stringent requirements of federal, state, and local environmental, occupational health and safety laws and regulations in the U.S. and other countries, including those governing (1) emissions to air, discharges to water, noise and odor emissions; (2) the generation, handling, storage, transportation, treatment, and disposal of waste materials; and (3) the cleanup of contaminated properties and human health and safety. Compliance with these laws and regulations results in ongoing costs. The Company could also incur substantial costs, including cleanup costs, fines, and civil or criminal sanctions, third-party property damage or personal injury claims, or costs to upgrade or replace existing equipment, as a result of violations of or liabilities under environmental laws or non-compliance with environmental permits required at its facilities. In addition, many of the Company's current and former facilities are located on properties with histories of industrial or commercial operations. Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company could become liable for the cost of investigating or remediating contamination at these properties if contamination requiring such activities is discovered in the future. There is also inherent difficulty

24

in assessing the Company's potential liability due to the large number of other potentially responsible parties. For example, a demand for the total cleanup costs of a landfill used by many entities may be asserted by the government using joint and several liability theories. Although the Company believes that there is a reasonable basis in law to believe that it will ultimately be responsible for only its share of these remediation costs, there can be no assurance that the Company will prevail on these claims. In addition, the scope of remedial costs or other environmental injuries are highly variable, and estimating these costs involves complex legal, scientific and technical judgments. The Company may become obligated to pay material remediation-related costs at its closed Tampa, Florida facility in the amount of approximately $13.2 million to $19.9 million, and at the Columbus, Georgia facility in the amount of approximately $5.7 million to $8.5 million.

The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved. Private parties, including current or former employees, could bring personal injury or other claims against the Company due to the presence of, or exposure to, hazardous substances used, stored or disposed of by it, or contained in its products, especially lead. Environmental requirements are complex and have tended to become more stringent over time. These requirements or their enforcement may change in the future in a manner that could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. The Company has made and will continue to make expenditures to comply with environmental requirements. These requirements, responsibilities and associated expenditures, if they continue to increase, could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. While the Company's costs to defend and settle claims arising under environmental laws in the past have not been material, the Company cannot provide assurance that this will remain so in the future.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

On November 12, 2008, the Environmental Protection Agency ("EPA") published new lead emissions standards under the National Ambient Air Quality Standards ("NAAQS"), which became effective on January 12, 2009. The new standards further restrict lead emissions by reducing the off-site concentration standards for lead in air from 1.5 micrograms per cubic meter to 0.15 micrograms per cubic meter. The Company believes that the new standards could impact a number of its U.S. facilities. Under the Clean Air Act ("CAA"), publication by the EPA of these ambient air quality standards initiates a process by which the states develop rules implementing the standards. Recently, some states have accelerated their implementation and the Company is working with these states to meet their requirements. Although the final impact on the Company's operations cannot be reasonably determined at the current time, the Company believes that the financial impact of compliance with these lead emissions standards on its U.S. facilities will be funded through normal operations. Noncompliance with these standards could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

On January 5, 2012, the EPA passed the National Emissions Standards for Hazardous Air Pollutants ("NESHAP") for secondary lead smelting. The final regulations include limits for lead and other fugitive emissions, particularly at the Company's lead recycling facilities, as well as additional testing and monitoring, recordkeeping, and reporting requirements. Although the Company currently believes a majority of these requirements will be met through efforts to attain compliance with NAAQS standards, our failure to attain compliance with NESHAP could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

On January 17, 2012, the City of Frisco, Texas initiated actions that could have prevented the Company from proceeding with projects designed to comply with certain NAAQS implementation requirements related to the Company's Frisco, Texas recycling facility and that could have imposed an involuntary closure of the facility. The Company contested the City's actions, and subsequently reached a settlement with the City in June 2012 whereby the Company will sell certain land around

26

the Company's facility for a total purchase price of $45.0 million, in return for the Company's agreement to cease operations at the site on or before December 31, 2012, assuming the City's funding commitments are met and the Company receives state certification for its remedial activities. If the funding obligations cannot be met, it is uncertain when the Company would be able to meet NAAQS and NESHAP compliance and continue operating the facility.

*** 

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. ...

*** 

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of March 31, 2012 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $27.7 million and $28.2 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

44.     Also on June 7, 2012 the Company reported its Fiscal 2012 Fourth Quarter Results through press release. The Company's press release reported, "[n]et sales of $782.6 million versus $774.5 million in the prior year fourth quarter; Operating income was $15.9 million versus $9.3 million in the fourth quarter of fiscal 2011; net loss was $2.7 million or ($0.03) per share as compared to the prior year period net loss of $13.7 million or ($0.18) per share; and free cash flow generation was approximately $55.7 million compared to a use of cash of ($14.7 million) in the prior year period.

45.     Defendant Bolch stated, "[o]ur fourth quarter results improved over the comparative prior year period, principally due to lower restructuring and impairment charges. We are making steady progress with substantial opportunities for further improvement in the areas of product cost, recovery through pricing and optimization of plant capacity."

46.     The disclosures made in the paragraphs above were materially misleading because the disclosures omitted the following material facts known by Defendants:

    a.  Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b.  The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

c.  The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection  of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

47.  Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008. Defendants were also on notice of major deficiencies in the Vernon facility's compliance with California regulations based on the Notice of Deficiency issued by the DTSC.

48.  On August 2, 2012, the Company issued a press release announcing Exide's financial results for the quarterly period ended June 30, 2012. Defendant Bolch stated, "[t]he benefit of price increases announced earlier this year was insignificant in the fiscal first quarter, but will be realized in July and beyond. In addition, we will continue to reduce third party lead sales as we move to close our recycling operation in Frisco, Texas."

49.  The Company's press release further stated that Exide, "achieved higher unit volume in aftermarket sales for Transportation Europe and Rest of World

("ROW"), and realized higher original equipment ("OE") unit sales in both Transportation segments when compared to the fiscal 2012 first quarter. Additionally in the current year period, the Company recorded higher sales throughout its global Network Power channels."

50.    Also in the August 2 press release, Defendant Damaska stated, "[t]he Company continues to execute its strategy to right-size Transportation Americas through the announced closure of our Bristol, Tennessee battery plant and the closure and land sale of our Frisco, Texas lead recycling facility. We believe these actions, among other ongoing initiatives will return the overall Americas region to profitability and allow us to ultimately utilize this long-lived deferred tax benefit."

51.    Finally, the August 2 press release provided that, "[a]s of June 30, 2012, the Company had cash and cash equivalents of $130.1 million and $152.5 million of availability under its revolving bank credit facility. This compares to cash and cash equivalents of $155.4 million and $152.8 million of availability under the revolving bank credit facility at March 31, 2012. Given the seasonal nature of a large portion of our business, inventory is built during the first and second fiscal quarters. This resulted in a use of free cash flow in the amount of $21.0 million in the fiscal 2013 period, down from a use of $31.3 million in the prior year comparable period."

52.    In addition, on August 2, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended June 30, 2012.   The Company reported net sales of $693.4 million as compared to net sales of $745.1 million in the

31

fiscal 2012 first quarter.  The Form 10-Q was signed by Defendant Damaska.  In the Form 10-Q, Defendants made the following disclosures:

*Environmental Matters*

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

***The Company received a number of notices of violation issued by the South Coast Air Quality Management District ("SCAOMD") for alleged violations of relevant air rules at its Vernon California recycling facility. On May 22, 2012 the Company agreed to a settlement including payment of monetary sanctions of $0.12 million to SCAOMD to resolve these notices of violation.***

The Company received a Notice of Proposed Assessment of Civil Penalty issued by the United States Environmental Protection Agency ("EPA") for an alleged violation related to its Frisco. Texas recycling facility's National Pollutant Discharge Elimination System (NPDES) permit. Effective July 3, 2012, the Company and EPA entered into a consent agreement for the Company to pay a penalty of $0.14 million to EPA to resolve the matter.

***The Company received an administrative enforcement order and first amendment to enforcement order issued by the Department of Toxic Substances Control ("DTSC") for alleged violations of relevant health and safety rules related to the operation and management of the storm water retention pond at its Vernon. California recycling facility. On July 9, 2012, the Company agreed to a payment of monetary sanctions of $0.2 million to DTSC to resolve the administrative order.***

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental

Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

The Company monitors and responds to inquiries from the EPA, equivalent state and local agencies and others at approximately 50 federally defined Superfund or state equivalent sites. While the ultimate outcome of the environmental matters described in this paragraph is uncertain due to several factors, including the number of other parties that may also be responsible, the scope of investigation performed at such sites and the remediation alternatives pursued by such federal and equivalent state and local agencies, the Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

June 30, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $27.0 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

53.    The statements in bold and italics in the above paragraphs were materially false and misleading. These statements misleadingly suggested that while the Company had violated certain environmental regulations at its Vernon facility

34

such violations were minor, such violations had been remedied, and such violations represented the only violations at the Vernon facility.   Specifically, while Exide disclosed that it had received notices of violations from the AQMD as well as an administrative enforcement order from DTCS, the Company misleadingly presented the alleged violations as minor infractions and further misleadingly suggested that the offending conditions had been remedied.   In truth, Exide's Vernon facility was emitting extremely toxic air and water contaminants, had not remedied the problems identified by the AQMD and the DTCS, and had received additional Notices of Deficiencies that were never disclosed.   In fact, AQMD officials have explained that reports of Exide's Vernon facility showed "a higher cancer risk affecting a larger number of residents than any other of the more than 450 regulated facilities in Southern California over the 25-year history of AQMD's monitoring of toxic air contaminants."[1]

54.    The disclosures made in the paragraphs above were further materially misleading because the disclosures omitted the following material facts known by Defendants:

a. Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

---

[1] *Los Angeles Times* article dated March 24, 2013.

35

b. The Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011;

c. The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

55. Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008. Defendants were also on notice of major deficiencies in their compliance with California environmental regulations based on the Notice of Deficiency issued on the Vernon facility by the DTSC.

56. On November 9, 2012 the Company reported its Fiscal 2013 Second Quarter results in a press release. The Company's press release reported that, "[f]iscal 2013 second quarter consolidated net sales were $712 million as compared to net sales of $773 million in the fiscal 2012 second quarter. Net sales in the fiscal 2013 period were negatively impacted by both foreign currency translation ($41.7) million and lead related pricing ($30.5) million. The decrease was partially offset by increased sales in Industrial Energy Americas, higher unit sales in the original equipment

36

("OE") channel in both Transportation segments, and modest pricing in the Americas' aftermarket channel."

57.     The November 9 press release also reported, "[g]ross profit for the quarter of $103.7 million, declined by $15 million when compared with the prior year period. A combination of continued high cost of spent batteries in the Americas, coupled with a lower LME price of lead weighed on results. The impact of this combination on the Americas business aggregated $18.6 million when compared to the prior year period; and was only partially offset by favorable pricing of $5.5 million, principally in the transportation aftermarket channel."

58.     The November 9 press release further reported, "fiscal 2013 second quarter operating income was $6.8 million compared to $21.2 million in the prior year second quarter. The decrease is primarily the result of higher spent battery input cost coupled with lower LME lead prices, and compressed margins on third party lead sales. Net loss for the current quarter was $13.9 million or ($0.18) per share compared to the prior year period net loss of $3.6 million or ($0.05) per share."

59.     In the November 9 press release, Defendant Bolch stated, "[w]e expect the normal seasonal nature of our business will result in higher revenue and substantially improved operating income in the second half of the fiscal year. This should be further supplemented by the combination of transportation aftermarket pricing and a better lead equation, assuming the cost of cores and LME lead pricing remain stable at the improved levels we saw in the month of October."

37

60.   On November 11, 2012 Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended September 30, 2012.  The Form 10-Q was signed by Defendant Damaska.  In the Form 10-Q Defendants made the following disclosures:

### Environmental Matters

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

*** 

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this

38

paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows, or results of operations.

The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of September 30, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $26.7 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities. Therefore, changes in estimates or future findings could have a material adverse effect on the Company's financial condition, cash flows, or results of operations.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for

39

supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $8.5 million.

61.   The disclosures made in the paragraphs above were materially misleading because the disclosures omitted the following material facts known by Defendants:

a.   Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

b.   The Vernon facility's hazardous conditions and/or the Notices of Deficiency issued by the DTSC on March 21, 2011 and August 2, 2012;

c.   The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection  of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

62.   Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008. Defendants were also on notice of major deficiencies in their compliance with California

40

regulations based on the Notices of Deficiency issued on the Vernon facility by the DTSC.

63.     On February 6, 2013 the Company reported Fiscal 2013 Third Quarter results in a press release.  The Company's press release reported, "[f]iscal 2013 third quarter consolidated net sales were $804.9 million as compared to net sales of $784.1 million in the fiscal 2012 third quarter. Net sales in the fiscal 2013 period were negatively impacted by foreign currency translation of $10.2 million and lead related pricing of $16.3 million. Excluding the negative impact of foreign currency translation and lead-related pricing, net sales increased 6% primarily due to increased sales in the motive power and network power channels of both Industrial Energy segments as well as higher unit sales in the aftermarket channel in Transportation Europe."

64.     The February 6 press release continued, "[g]ross profit for the third quarter of $120.1 million, declined by $6.4 million when compared with the prior year period. Continued higher spent battery acquisition costs in the Americas combined with lower margins from third party lead sales negatively impacted gross margin by approximately $11 million. Improvement in spent battery acquisition costs in the U.S. began in November 2012. This trend has continued into the early part of the fiscal fourth quarter which should benefit both Americas businesses if the trend continues."

65.     The Company also reported in the February 6 press release, "[fiscal third quarter operating income, excluding $15.8 million for restructuring and impairment charges, was $20.5 million compared to $30.3 million, excluding $2.1 million for

41

restructuring and impairment charges, in the prior year third quarter. The decrease is primarily due to lower gross profits discussed above. Current period restructuring charges were $5.2 million related to the closure of the Bristol, Tennessee flooded battery manufacturing facility, the idling of lead recycling operations in Reading, Pennsylvania and the closure of GNB India. Impairment charges of $10.6 million are principally related to asset write-downs for the closure of GNB India and the sale of the Australasia transportation business that was completed on February 4, 2013. Net loss for the fiscal 2013 third quarter was $15.4 million or $0.20 per share as compared to the prior year period net income of $68.2 million or $0.84 per share. Fiscal 2012 third quarter net income included the non- cash reversal of the tax valuation allowance in France for $76.7 million partially offset by a $13.4 million charge to settle a tax audit in Spain."

66.    Also on February 6, 2013, Exide filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended December 31, 2012.  The Form 10-Q was signed by Defendant Damaska.   In the Form 10-Q, Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

On December 7, 2012, the Company entered into an Agreed Order with the Texas Commission on Environmental Quality ("TCEQ") that includes a penalty of $0.6 million to resolve a notice of enforcement issued by TCEQ for alleged air and waste rule violations at the Company's now closed Frisco, Texas recycling facility.

Effective December 17, 2012, the Company and the United States Environmental Protection Agency ("EPA") entered into a consent agreement that includes a penalty of $0.2 million to resolve alleged air and waste rule violations at the Frisco, Texas recycling facility.

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the EPA, equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

condition, cash flows, or results of operations.

The Company has established liabilities for environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate. As of December 31, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $25.6 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities. Therefore, changes in estimates or future findings could have a material adverse effect on the Company's financial condition, cash flows, or results of operations.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $8.5 million.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

67.     The disclosures made in paragraphs above were further materially misleading because the disclosures omitted the following material facts known by Defendants:

    a.  Since at least 2010 Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

    b.  The Vernon facility's hazardous conditions and/or the Notices of Deficiency issued by the DTSC on March 21, 2011 and August 2, 2012;

    c.  The circumstances described in paragraphs (a) and (b) above constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

68.     Defendants were on notice of the shockingly hazardous levels of arsenic emissions based on Exide's own arsenic emissions source tests from 2010 and 2012 that showed a significant spike in emissions over tests in 2006 and 2008.  Defendants were also on notice of major deficiencies in their compliance with California regulations based on the Notices of Deficiency issued on the Vernon facility by the DTSC.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

69.    Defendants' Class Period materially false and misleading statements concealed the large potential liability arising out at the toxic conditions of its Vernon, California facility, and the inability of the Company to meet its debt obligations and potential insolvency. As a result, Exide stock traded at artificially inflated prices during the Class Period.

70.    The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

    a.    Exide's battery recycling facility was leaking arsenic into the environment, at levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas;

    b.    Exide's battery recycling facility was not in compliance with California regulations and had received numerous notices and/or complaints from the AQMD and DTSC;

    c.    Exide knew that based on actual and projected revenues and expenses it would not be able to meet its debt repayment obligations and other pledges and promises under its debt agreements and indentures. Specifically, the Company knew that it could not satisfy its obligations under a $200 million revolving credit facility, a $675 million bond, and a $55.7 million floating rate convertible note due in September 2013; and

46

d.    as a result, Exide knew its environmental liabilities, debt obligations and potential insolvency supported neither its statements to investors that the Company was solvent, its quarterly guidance, nor the inflated share price targets the investment community was modeling based on Defendants' Class Period statements and guidance.

**THE TRUTH EMERGES**

71.    On April 4, 2013 various news sources reported that Los Angeles Council members had held a hearing calling for the city attorneys to take action against the Company to protect residents from the potentially fatal conditions caused by Exide's unhealthy practices. Also, on April 4, 2013, Debtwire revealed that the Company had engaged the services of noted restructuring specialist firms Lazard and Akin Gump after the Company could not arrange financing through traditional means. That same day, the Company confirmed that financial advisory firm Lazard had been retained, "to advise the [C]ompany on financing alternatives to maximize the value of the [C]ompany for all stakeholders."

72.    On this news Company shares fell, on April 4, 2013, $1.24 per share to $1.37 per share (a 46% drop) before trading was halted.

73.    On April 25, 2013, at 6:30 a.m., Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring the Company to suspend operations at its Vernon facility, asserting that Exide's

47

underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

74.     In response to this news, Exide's shares closed at $1.02 on April 25, 2013, compared to a closing price of $1.34 on April 24, 2013, a drop of 24%, on heavy trading volume.

75.     As a result of Defendants' materially false and misleading statements, Exide stock traded at inflated levels during the Class Period.   However, after the above revelations seeped into the market, Exide's shares were hammered by massive sales, causing substantial declines.

**DEFENDANTS FAILED TO DISCLOSE EXISTING EVENTS, UNCERTAINTIES, AND TRENDS IN VIOLATION OF SEC REGULATION S-K, ITEM 303(A), WHICH RENDERED CLASS PERIOD STATEMENTS MATERIALLY FALSE OR MISLEADING**

76.     SEC Regulation S-K (and SEC Forms 10-K and 10-Q) requires disclosure of certain information, including information required to be disclosed under Item 303(a) of Regulation S-K (17 CFR §229.303), in the non-financial-statement portions of annual reports filed on SEC Form 10-K, and quarterly reports filed on SEC Form 10-Q under the 1934 Securities Exchange Act. 17 C.F.R. § 229.10.

77.     Pursuant to Subsection (a)(3)(ii) of Item 303, a registrant must "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

continuing operations." 17 C.F.R. § 229.303(a)(3). Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3. The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

78.     Beginning by at least the fiscal year ended 2011, and continuing through May 2013, Defendants were aware of material unfavorable circumstances at Exide's Vernon battery recycling facility.  Specifically, Defendants were aware that Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas.  These circumstances were, pursuant to Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing

49

operations," 17 C.F.R. § 229.303(a)(3), which were required to be disclosed but were not, rendering Defendants' statements materially false and misleading.

## NO SAFE HARBOR

79.    Exide's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.

80.    The Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer and/or director of Exide who knew that the forward-looking statement was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statement would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

81.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   documents would be issued or disseminated to the investing public; and knowingly

2
    and substantially participated or acquiesced in the issuance or dissemination of such
3

4   statements or documents as primary violations of the federal securities laws. As set

5   forth elsewhere herein in detail, Defendants, by virtue of their receipt of information

6
    reflecting the true facts regarding Exide, their control over, and/or receipt of
7

8   modification of Exide's allegedly materially misleading misstatements and/or their

9   associations with the Company which made them privy to confidential proprietary

10
    information concerning Exide, participated in the fraudulent scheme alleged herein.
11

12                   **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                     **FRAUD-ON-THE-MARKET DOCRTINE**
13

14          82.    At all relevant times, the market for Exide common stock was an

15   efficient market for the following reasons, among others:

16
            a)    Exide stock met the requirements for listing, and was listed and
17

18   actively traded on the NASDAQ, a highly efficient and automated market;

19          b)    According to the Company's Form 10-K filed June 7, 2012, the

20   Company had 78,346,859 shares outstanding as of May 25, 2012. During the Class
21

22   Period, on average, more than half a million shares of Exide stock were traded on a

23   daily basis, demonstrating a very active and broad market for Exide stock and

24   permitting a very strong presumption of an efficient market;
25

26          c)    as a regulated issuer, Exide filed periodic public reports with the

27   SEC;

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

d) Exide regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major news wire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e) Exide was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

f) numerous National Association of Securities Dealers' member firms were active market-makers in Exide stock at all times during the Class Period; and

g) unexpected material news about Exide was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

83. As a result of the foregoing, the market for Exide common stock promptly digested current information regarding Exide from publicly available sources and reflected such information in Exide's stock price. Under these circumstances, all purchasers of Exide common stock during the Class Period suffered similar injury through their purchase of Exide common stock at artificially inflated prices, and a presumption of reliance applies.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**LOSS CAUSATION**

84.     During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Exide's business fundamentals and engaged in a scheme to deceive the market.

85.     By artificially inflating and manipulating Exide's stock price, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, as detailed herein, it caused the price of Exide stock to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Exide stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

86.     This is a class action on behalf of those who purchased or otherwise acquired Exide common stock between June 1, 2011 and April 24, 2013, inclusive, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the Defendants violated the Exchange Act; (b) whether the Defendants omitted and/or misrepresented material facts; (c) whether the Defendants knew or recklessly

disregarded that their statements were false and misleading; (d) whether the Defendants artificially inflated the price of Exide common stock; and (e) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

88.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

89.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

90.    Throughout the Class Period, Defendant Exide and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Exide common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

91.    During the Class Period, Defendant Exide and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of Exide common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase Exide common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Defendants Exide and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

92.    In addition to the duties of full disclosure imposed on Defendants Exide and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Exide's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

93.    Defendants Exide and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

94.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Exide common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Exide common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Exide and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased Exide stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

95.     Had Plaintiffs and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Exide and the Individual Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Exide shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.     By virtue of the foregoing, Exide and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.P.R. §240.10-5

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

97.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

98.    The Individual Defendants had control over Exide and made the materially false and misleading statements and omissions on behalf of Exide within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their controlling shareholder status, executive positions, board membership, and/or stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contends were false and misleading The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

99.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

100.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of himself and the Class, pray for judgment follows:

A.   Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of Federal Rules of Civil Procedure and Plaintiffs counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

//

//

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a trial by jury.

3

4

5     DATED: June 4, 2013                    **GREEN & NOBLIN, P.C.**

6

7

                                           By: *Robert S. Green*
8
                                               Robert S. Green
9
                                           James Robert Noblin
10                                         Lesley E. Weaver
                                           700 Larkspur Landing Circle, Suite 275
11                                         Larkspur, CA 94939
                                           Telephone: (415) 477-6700
12                                         Facsimile: (415) 477-6710
                                           Email: gnecf@classcounsel.com
13                                         -and-
                                           4500 East Pacific Coast Highway
14                                         Fourth Floor
                                           Long Beach, California 90804
15                                         Tel: (562) 391-2487
16
17                                         Attorney for Plaintiffs,
                                           JAMES CASSELLA and SANDRA
18                                         WEITSMAN
19
20                                         William B. Federman, OBA #2853
                                           (*Pro Hac Vice pending*)
21                                         FEDERMAN & SHERWOOD
                                           10205 North Pennsylvania Avenue
22                                         Oklahoma City, Oklahoma 73120
                                           Telephone: (405) 235-1560
23                                         Facsimile: (405) 239-2112
                                           Email: wbf@federmanlaw.com
24
25
26
27
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

**Plaintiffs Certification of Investment of
Exide Technologies [NASDAQ: XIDE]**

I, _JAMES CASSELLA_, hereby certify that the following information is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the Complaint in this action and authorize the filing of this Certification as an exhibit to the Complaint, or any substantively similar complaint or amended complaint to be filed in the future. I retain the law office of Federman & Sherwood, and any other counsel with whom Federman & Sherwood deems appropriate to associate with, to pursue this action on my behalf on a contingency fee basis.

2. If chosen, I am willing to serve as a representative party on behalf of the class (the "Class"), either individually or as part of a group on behalf of the Class as defined in the Complaint, including providing testimony at deposition or trial (if necessary). I am also willing to participate on an executive committee of shareholders.

3. I have made the following transaction(s) during the Class Period in Exide Technologies [NASDAQ: XIDE] securities (which are the subject of this action) as follows:

| # SHARES PURCHASED | DATE OF PURCHASE | PRICE PAID PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SELLING PRICE |
|---|---|---|---|---|---|---|
| 10,000 | 6/2/2011 | 7.7983 | Common | | | |
| 5,000 | 6/2/2011 | 7.6643 | Common | | | |
| 10,000 | 6/2/2011 | 7.5203 | Common | | | |
| 5,000 | 6/6/2011 | 7.4684 | Common | | | |
| 5,000 | 6/6/2011 | 7.3814 | Common | | | |
| 10,000 | 6/13/2011 | 7.1269 | Common | | | |
| 2,000 | 6/24/2011 | 7.2035 | Common | | | |
| 10,000 | 6/1/2012 | 2.3106 | Common | | | |

(continue list on blank piece of paper, if necessary)

4. I did not purchase these securities at the direction of my attorney or in order to participate in a lawsuit under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5. During the 3-year period preceding the date of this Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

6. I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court, except for such reasonable costs and expenses directly relating to my service as a representative of the Class and as ordered and approved by the Court.

Signed under penalty of perjury, under the laws of the United States of America, this 24th day of MAY, 2013.

_____
Investor Signature

JAMES CASSELLA
Print Name

REDACTED
Home Telephone Number

REDACTED
Cell Telephone Number

REDACTED
Home Address

REDACTED
City          State          Zip

REDACTED
E-Mail Address

REDACTED
Secondary Email Address (if any)

**Return this completed form by e-mail or fax to:**
K. Lynn Nunn @ FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
Email: kln@federmanlaw.com
Website: www.federmanlaw.com

NOT A CURRENT OF FORMER
EMPLOYEE OF EXIDE

| # Shares Purchased | Date of Purchase | Price Per Share | Class |
|---|---|---|---|
| 5,000 | 6/1/2012 | 2.3014 | Common |
| 5,000 | 6/1/2012 | 2.3013 | Common |
| 5,000 | 6/1/2012 | 2.3013 | Common |

Plaintiffs Certification of Investment of
Exide Technologies [NASDAQ: XIDE]

I, ___Sandra Weitsman_____, hereby certify that the following information is
true and correct to the best of my knowledge, information and belief:

    1.   I have reviewed the Complaint in this action and authorize the filing of this Certification as an exhibit to
the Complaint, or any substantively similar complaint or amended complaint to be filed in the future.  I retain the
law office of Federman & Sherwood, and any other counsel with whom Federman & Sherwood deems
appropriate to associate with, to pursue this action on my behalf on a contingency fee basis.

    2.   If chosen, I am willing to serve as a representative party on behalf of the class (the "Class"), either
individually or as part of a group on behalf of the Class as defined in the Complaint, including providing
testimony at deposition or trial (if necessary).  I am also willing to participate on an executive committee of
shareholders.

    3.   I have made the following transaction(s) during the Class Period in Exide Technologies [NASDAQ:
XIDE] securities (which are the subject of this action) as follows:

| # SHARES PURCHASED | DATE OF PURCHASE | PRICE PAID PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SELLING PRICE |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  | SEE | ATTACHED |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

(continue list on blank piece of paper, if necessary)

    4.   I did not purchase these securities at the direction of my attorney or in order to participate in a lawsuit
under the Securities Act of 1933 or the Securities Exchange Act of 1934.

    5.   During the 3-year period preceding the date of this Certification, I have not sought to serve, nor have I
served, as a representative to any party or on behalf of any class in any action arising under the Securities Act
of 1933 or the Securities Exchange Act of 1934.

    6.   I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond
my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court, except for such
reasonable costs and expenses directly relating to my service as a representative of the Class and as ordered
and approved by the Court.

Signed under penalty of perjury, under the laws of the United States of America, this 30th day of
May 2013.

| | |
|---|---|
| _Investor Signature_ | REDACTED<br>Home Address |
| Sandra Weitsman<br>Print Name | REDACTED<br>City    State    Zip |
| REDACTED<br>Home Telephone Number | REDACTED<br>E-Mail Address |
| REDACTED<br>Cell Telephone Number | REDACTED<br>Secondary Email Address (if any) |

**Return this completed form by e-mail or fax to:**
K. Lynn Nunn @ FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
Email: kln@federmanlaw.com
Website: www.federmanlaw.com

**Exide Technologies**

| Date of Purchase | Price Paid Per Share | Number of Shares Purchased | Class of Stock (e.g., Common) | Number of Shares Sold, If Any | Dates Sold | Sell Prices |
|---|---|---|---|---|---|---|
| 7/22/11 | $7.66 | 204,163 | common | 0 shares sold | n/a | n/a |
| 8/8/11 | $4.957 | 204,163 | common | 0 shares sold | n/a | n/a |